UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
COSMO MEZZINA,

             Plaintiff,

      - against –

PORT IMPERIAL FERRY CORP. d/b/a
NY WATERWAY,

           Defendant.

------------------------------X

                              **MEMORANDUM AND ORDER**
                               22 Civ. 1987 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

      Plaintiff Cosmo Mezzina ("plaintiff" or "Mezzina") filed this action on March 9, 2022 to recover damages for injuries he sustained while employed as a deckhand for defendant Port Imperial Ferry Corp. d/b/a New York Waterway ("defendant" or "NY Waterway"). See ECF No. 1 ("Compl."). Specifically, plaintiff seeks $5 million in damages predicated on a negligence claim under the Jones Act, 46 U.S.C. § 30104 et seq., and an unseaworthiness claim under general maritime law, and $500,000 in maintenance, cure, and medical expenses. Compl. ¶¶ 9-20.

      Presently before the Court are the parties' cross-motions for summary judgment on the issue of liability.[1] See ECF Nos. 27, 37. For the reasons set forth below, plaintiff's motion for partial

---

[1] Neither party has brought a motion concerning plaintiff's claim for maintenance and cure.

summary judgment is denied, and defendant's motion for partial summary judgment is granted.

## BACKGROUND

The following facts are undisputed, unless otherwise noted.[2] They are drawn from plaintiff's Local Civil Rule 56.1 statement ("Pl. 56.1"), ECF No. 30; defendant's Local Civil Rule 56.1 counterstatement ("Def. Counter 56.1"), ECF No. 32; defendant's Local Civil Rule 56.1 statement ("Def. 56.1"), ECF No. 38; plaintiff's Local Civil Rule 56.1 counterstatement ("Pl. Counter 56.1"), ECF No. 47; and admissible materials submitted by the parties in connection with the present motions.

### I.   Factual Background

For nearly twenty years, from June 2002 until his accident on October 1, 2021, plaintiff was employed by NY Waterway as a deckhand.   ECF No. 29-1 ("Mezzina Dep.") 12:11-19, 40:6-18. Plaintiff's responsibilities included collecting tickets, checking the vessel's engine, and tying up the vessel at the dock.   Id. 40:19 – 41:5.   During this time, plaintiff served approximately

---

[2] Pursuant to Local Civil Rule 56.1, the Court treats as admitted the facts set forth in the Rule 56.1 statements unless "specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).  In addition, "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."  Local Civil Rule 56.1(d).

ten to fifteen three-month stints on the "Garden State" -- the vessel on which his accident occurred.  Id. 45:2-25.

On October 1, 2021, the Garden State was servicing a route between Hoboken, New Jersey and Pier 11 in New York City.  Pl. Counter 56.1 ¶ 5.  On that day, the Garden State had a crew of three -- Captain Mohamed Abdelrahman, plaintiff, and a second deckhand, Roger McCullough.  Id. ¶¶ 5-7.  Plaintiff recalls that the water was "calm" at the start of his shift that day.  Mezzina Dep. 57:12-25.

About an hour after plaintiff's shift began, as the captain backed the vessel away from Pier 11 departing for Hoboken, the current and the waves pushed the vessel back into Pier 11 dock.  Pl. Counter 56.1 ¶¶ 8-10.  Although the vessel appeared to have sustained minor damage, the captain decided to complete the trip to Hoboken as the passengers were unharmed.  Id. ¶¶ 11-13; ECF No. 29-2 ("Abdelrahman Dep.") 16:15-25, 17:16-23.  Once the passengers disembarked, the captain noticed additional damage to the vessel, and based on instructions from his manager, docked the Garden State at a work barge to undergo repairs.  Pl. Counter 56.1 ¶ 12.

Several minutes after tying the vessel to the work barge, the captain requested that plaintiff assist him with opening the hatch at issue in this litigation.  Id. ¶¶ 17, 18.  The hatch (pictures of which are available in Appendices A-C) was located on the floor

-3-

of the aisle leading to the ship's stern, just before the only door that opened to the afterdeck (i.e., the deck at the back of the ship), and in between rows of passenger seating and the engine room door.[3]  See Def. Counter 56.1 ¶¶ 16, 28; Mezzina Dep. 67:24 - 69:13; ECF No. 40-2.  The captain and plaintiff together removed the hatch cover by hand and placed the cover on the floor in between the hatch and the stern door so that the captain could access the vessel's lower deck, or the "lazarette," to assess the damage to the vessel.  Pl. Counter 56.1 ¶¶ 18, 19, 25, 26; Mezzina Dep. 75:16-25, 78:13 - 80:22.  Without the cover on, the hatch opening measured approximately 39 inches long by 32 inches wide. Def. Counter 56.1 ¶ 18.

Before descending the ladder leading to the lazarette, the captain asked plaintiff to retrieve barricades stored on the vessel.  Pl. Counter 56.1 ¶ 27; Mezzina Dep. 82:6-15; Abdelrahman Dep. 43:19 - 44:2.  The barricades consist of multiple units made of a synthetic material that can snap together.  Pl. Counter 56.1 ¶¶ 27-31; Def. Counter 56.1 ¶ 28.  Each measures approximately 39.5 inches high by 39.5 inches wide, is bright yellow, and contains reflective material.  Id.; Pl. Counter 56.1 ¶¶ 28.

---

[3] While exact measurements are not provided by the parties, plaintiff's expert and photographs of the vessel suggest that, when the hatch was open, there remained less than a foot of flooring between the open hatch and rows of passenger seating, and at most a few inches between the hatch and the engine door.  See, e.g., Pl. Mem. at 6; ECF No. 29-7 at 15.

-4-

According to plaintiff, the barricades are intended to serve as a visual warning for potential danger rather than as a physical barrier.[4]  Mezzina Dep. 125:9-21.  Plaintiff then set up the barricades[5] around at least two sides of the hatch: (1) the front side -- the direction from which plaintiff approached the hatch before his fall -- and (2) the starboard side running vertically along the aisle between the hatch and the rows of passenger seating.[6]  Pl. Counter 56.1 ¶¶ 30-32; see Appendix B.

Around this time, the captain entered the lazarette and plaintiff walked to the front of the vessel to speak with the other deckhand, McCullough, who sat in the first row of passenger seats due to an injury he had sustained in the collision that rendered him unable to continue working.  Pl. Counter 56.1 ¶¶ 16, 33; Def.

---

[4] As the discussion below will demonstrate, under the facts here, this is a distinction without a difference.  As Figure 4 of plaintiff's moving memorandum establishes, ECF No. 28 at 7, it would have been necessary to move a barrier to navigate around the open hatch, i.e. the barriers were physical as well as visual.  In addition, plaintiff offers no reason why a substantial, visual warning would have been insufficient under the circumstances.

[5] Plaintiff testified that he set up the barricades after the captain entered the lazarette, while the captain testified that he and plaintiff set up the barricades together before the captain descended.  Mezzina Dep. 83:19-25; Abdelrahman Dep. 47:11-18.  This fact is not material to the Court's analysis.

[6] The captain and plaintiff disagree as to the number of sides of the hatch the barricades surrounded.  Specifically, plaintiff testified to setting up the barricades around two sides of the hatch, while the captain testified to barricading three sides of the hatch.  Def. Counter 56.1 ¶¶ 28-30.  However, this disagreement does not create a genuine issue of material fact, as it is undisputed that barricades blocked the side of the hatch from which plaintiff fell.  Pl. Counter 56.1 ¶¶ 30, 31.  Moreover, regardless of the number of barriers, plaintiff himself had opened the hatch minutes before his fall.  See infra note 10.

Counter 56.1 ¶ 10; Mezzina Dep. 86:10 – 87:18; ECF No. 40-2; Appendix D.  During this time, plaintiff testified to standing approximately 10 to 12 feet from the open hatch, Mezzina Dep. 100:14 – 101:9, though plaintiff's counsel points out without any specificity that the distance must have been greater given the length of the vessel, Pl. Counter 56.1 ¶ 34.  Regardless, plaintiff acknowledged that he could see the barricades from his position and did not observe anyone move them.  Mezzina Dep. 100:14 – 101:4; Pl. Counter 56.1 ¶ 36.  Similarly, the captain testified that he did not move the barricades from their original position. Abdelrahman Dep. 50:11-16; 55:11 – 56:9.

Mezzina recalled that the vessel started "rocking left and right, . . . banging against the pier."  Mezzina Dep. 89:17-25. The captain exited the lazarette and testified that he restored the barricades to their original position surrounding the open hatch.[7]  Abdelrahman Dep. 50:11-16; 55:11 – 56:9.  He then instructed plaintiff to "get the [vessel's fourth] line," located on the stern, to tie the unsecured starboard stern of the Garden State to the work barge.[8]  Pl. Counter 56.1 ¶ 38; Mezzina Dep.

---

[7] Although plaintiff denies this fact in his Rule 56.1 Statement in opposition to defendant's motion for summary judgment, Pl. Counter 56.1 ¶ 37, plaintiff testified that he did not see anyone move the barricades and that he could still see them after the captain exited the lazarette, Pl. Counter 56.1 ¶¶ 36, 42.

[8] Previously, when they docked the ship, the captain and plaintiff had secured the vessel to the work barge with three lines.  Def. Counter 56.1 ¶ 14.

89:17-25; Abdelrahman Dep. 50:21 – 52:13. During this conversation, plaintiff was positioned even closer to the open hatch than when he was speaking to McCullough. Pl. Counter 56.1 ¶ 42. Plaintiff testified that throughout this exchange he could still see the barricades and did not see anyone move them. <u>Id.</u> The captain then exited the Garden State via the front of the vessel in order to catch the line from the work barge and further secure the ship. Pl. Counter 56.1 ¶ 41. At this point, plaintiff testified that he ran "a little bit" down the aisle toward the stern door "[b]ecause the boat was rocking" in order to retrieve and throw the line to the captain standing on the work barge. Mezzina Dep. 92:18-93:20, 95:2-6; Abdelrahman Dep. 51:18-52:13, 53:23-54:3. Plaintiff concedes that NY Waterway never instructed him to run when the boat was rocking. Mezzina Dep. 93:11-15.

While running, plaintiff fell into the open hatch.[9] Pl. Counter 56.1 ¶ 44. Although the exact timing is not clear, based

---

[9] Plaintiff improperly attempts to amend his testimony and to create genuine issues of material fact through a declaration filed on June 23, 2023 in support of his opposition to defendant's motion for summary judgment. ECF No. 45. There, plaintiff states -- in direct contradiction to his deposition testimony -- that when he fell into the open hatch "there was no barricade set up" and that he chose to walk in the narrow space between the open hatch and the passenger seats after having seen the captain do so. <u>Id.</u> ¶¶ 18-19. However, "[f]actual issues that a party creates by filing an affidavit crafted to oppose a summary judgment motion that contradicts that party's prior testimony are not 'genuine' issues for trial." <u>Moll v. Telesector Res. Grp., Inc.</u>, 760 F.3d 198, 205 (2d Cir. 2014). Thus, this Court will not consider these contradictory statements made by plaintiff following the completion of discovery and the filing of defendant's motion for summary judgment.

on testimony and the video surveillance captured from a working camera stationed on the work barge ("Work Barge Video"),[10] plaintiff's fall occurred less than six minutes after he himself opened the hatch with the captain.  Work Barge Video at 9:00-14:42.  Although plaintiff testified that he did not see the barricades immediately prior to his fall, he also stated that he did not even look to see if they were still up before running toward the stern door.[11]  Mezzina Dep. 94:5-25; 100:14 – 101:25. No barricade fell into the lazarette with plaintiff.  Mezzina Dep. 94:19-22;; Abdelrahman Dep. 54:10 - 55:3.  Upon hearing screaming

---

[10] This video recording, provided to the Court on a USB drive by plaintiff along with his motion for summary judgment, does not provide any insight into the events that occurred inside the Garden State.  However, it does enable the viewer to observe the crew's movements in and out of the vessel, and thus, in conjunction with deposition testimony, it is possible to determine the approximate time that passed between the removal of the hatch cover and plaintiff's fall.  The timeline according to the video is as follows: the Garden State pulls up to the work barge approximately two minutes and 20 seconds into the video.  For the next 2 minutes and 45 seconds, from approximately 2:30 through 5:15, the video shows (and testimony confirms) Mezzina and the captain tying the vessel to the work barge.  Mezzina Dep. 64:4-12; Abdelrahman Dep. 23:1 – 27:13.  The captain and plaintiff then enter the interior of the vessel, out of view of the recording, and remain inside for under two minutes until approximately 7:00, when the captain exits the vessel and walks along the work barge to photograph the starboard side of the vessel.  Id. 27:14 – 28:19.  After nearly two minutes, at approximately 8:55, the captain reenters the interior of the vessel.  Testimony suggests that the captain and plaintiff removed the hatch cover during this time.  Id. 32:21-24.  A little over five minutes later, at 14:06, the captain exits the vessel and walks along the vessel's starboard side to catch the line from Mezzina, according to testimony.  Id. 52:14 – 54:3; Mezzina Dep. 95:2-6.  At 14:40, 34 seconds later, the captain runs back toward and into the vessel after he heard screaming from inside the vessel.  Abdelrahman Dep. 54:4-6.  Accordingly, it is undisputed that the hatch cover was removed sometime after the eight minute 55 second mark of the video and that plaintiff fell into the hatch no later than the 14 minute 40 second mark -- less than six minutes after the hatch was opened.

[11] There is no suggestion by either party that the third crew member, McCullough, moved the barricades.

while he stood on the work barge, the captain ran back to the vessel.  Def. Counter 56.1 ¶ 40; Work Barge Video at 14:42-14:52. The captain testified that when he arrived to help plaintiff out of the lazarette, the barricades appeared to have been moved from surrounding at least two sides of the hatch to a different position, resting vertically along the aisle and perpendicular to the rows of passenger seating.[12]   Def. Counter 56.1 ¶ 44; Pl. Counter 56.1 ¶ 51; Abdelrahman Dep. 54:10 - 55:10, 55:25 – 56; see Appendix C.

## II.  Procedural Background

Following the completion of discovery, on March 16, 2023, the Court set a schedule for the parties to brief their cross motions for summary judgment.  ECF No. 26.  On May 5, 2023, Mezzina filed his motion for summary judgment, along with his memorandum of law, Rule 56.1 Statement, and supporting declarations and exhibits. ECF Nos. 27-31.  On June 6, 2023, defendant filed its opposition to plaintiff's summary judgment motion ("Def. Opp."), as well as its Rule 56.1 Statement in opposition to plaintiff's motion and supporting declarations and exhibits.  ECF Nos. 32-36.  Defendant also filed a cross-motion for summary judgment, accompanied by its

---

[12] Plaintiff testified that he did not see the guardrails again that day after his fall, as he was preoccupied with his injury and "was not looking at anything."  Mezzina Dep. 100:4-9; 106:10-20.

memorandum of law ("Def. Mem."), its Rule 56.1 Statement in support of its motion for summary judgment, and supporting declarations and exhibits.  ECF Nos. 37-43.  On June 23, 2023, plaintiff filed its Rule 56.1 Statement in opposition to defendant's motion for summary judgment, an opposition to defendant's summary judgment motion ("Pl. Opp."), and supporting declarations and exhibits. ECF Nos. 44-47.  That same day, plaintiff filed his reply, ECF No. 48 ("Pl. Reply"), and on July 7, 2023, defendant filed its reply ("Def. Reply") and supporting declarations, ECF Nos. 49-53.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson, 477 U.S. at 248.

"The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment."  Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).  "In moving for summary judgment against a party who

will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)); accord PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 105 (2d Cir. 2002). "[I]n assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sec. Ins. Co. of Hartford, 391 F.3d at 83.

Once the moving party has satisfied its burden, to defeat the motion, "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "Conclusory allegations will not suffice to create a genuine issue." Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990). There must be more than a "scintilla of evidence in support of the [non-movant's] position"; "there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. In other words, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material

facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, "[i]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment."  Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987); see also Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.").  "If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is appropriate."  Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991).

"The same standard of review applies when," as here, "the court is faced with cross-motions for summary judgment."  Bell v. Pham, No. 09 Civ. 1699 (PAC), 2011 WL 1142857, at *2 (S.D.N.Y. Mar. 24, 2011) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)).  "Each party's motion must be reviewed on its own merits, and the Court must draw all reasonable inferences against the party whose motion is under consideration."  Id.

**DISCUSSION**

## I.   Plaintiff's Motion for Summary Judgment

Plaintiff's motion for summary judgment raises three arguments, none of which require any examination of plaintiff's own role in his accident.   First, plaintiff relies on the "Protection of the Crew" regulation, 46 CFR § 42.15-75(d), in an effort to establish that the vessel was unseaworthy as a matter of law and that defendant is <u>per se</u> negligent for failing to provide "satisfactory means" to protect plaintiff from the open hatch, thus "precluding any proof of plaintiff's comparative fault."   ECF No. 28 ("Pl. Mem.") at 11-17.   Second, plaintiff argues that defendant's violation of the Protection of the Crew regulation triggers the application of <u>The Pennsylvania</u> Rule, thus shifting from plaintiff to defendant the burden of proving causation.   <u>Id.</u> at 17-20.   Third, plaintiff endeavors to rely on self-described discovery failures to preclude defendant from contesting liability.   <u>Id.</u> at 20-22.   For the reasons set forth below, plaintiff's efforts to prevail on legal doctrines and thus avoid a full examination of the facts fails.

### a. Negligence <u>Per Se</u> and Unseaworthiness as a Matter of Law

#### i. Legal Standard

Where a shipowner has violated a statutory or regulatory duty that results in the injury or death of an employee, the shipowner

-13-

may be liable without regard to negligence.  Kernan v. American Dredging Co., 355 U.S. 426, 431 (1958).  Moreover, The Pennsylvania Rule, "an oddity of admiralty law," shifts to defendants the burden of disproving causation where defendants have violated a maritime safety statute or regulation.  Wills v. Amerada Hess Corp., 379 F.3d 32, 42-43 (2d Cir. 2004) (citing The Pennsylvania, 86 U.S. 125, 136 (1873)).  However, a statutory or regulatory violation does not automatically trigger the application of The Pennsylvania Rule, which "is limited 'to the violation of a statute intended to prevent the catastrophe which actually transpired.'"  Reynolds v. Sealift, Inc., 311 F. App'x 422, 425 (2d Cir. 2009) (quoting Wills, 379 F.3d at 43).

### ii.  Application

Plaintiff first asserts in his motion for summary judgment that defendant violated the United States Coast Guard Protection of the Crew regulation by failing to protect the open hatch in a "satisfactory" manner.  Pl. Mem. at 11-17.  According to plaintiff, that regulatory violation has a direct nexus to plaintiff's injury; thus, the Court should find defendant liable on theories of negligence per se and unseaworthiness as a matter of law.  Id. at 15-17.  Further, plaintiff argues that, pursuant to The Pennsylvania Rule, the Court should shift to defendant the burden of disproving that the violation of the Protection of the Crew

regulation caused plaintiff's injury.  Id. at 17-20.  However, in his answering memorandum of law on defendant's motion for summary judgment, plaintiff essentially concedes this argument, stating that he "assumes that the Court will not apply" the requirements of the Protection of the Crew regulation to the Garden State.  Pl. Opp. at 1 n. 2.  While not a forthright concession, we understand it as such.  Regardless, while we are not privy to plaintiff's counsel precise thinking, there are two independent reasons that support a finding that the regulation does not apply to the Garden State, and thus we need not reach the question of whether defendant violated the regulation.

First, the requirements of the Protection of the Crew regulation do not apply to vessels "engaged exclusively in voyages on waters within the United States . . . and which are determined not to be 'coastwise' or 'Great Lakes voyages.'"  46 CFR § 42.03-5(b)(1)(v).  Plaintiff does not dispute that Garden State's certificate of inspection states that its "routes permitted" "are within the headings 'Lakes, Bays, and Sounds'" and "does not list the headings 'Coastwise' or 'Great Lakes,' which include routes of greater severity."  Pl. Counter 56.1 ¶¶ 56-58.  Specifically, the certificate of inspection "describes the [vessel's] permitted routes as 'lower New York Bay inside of a line drawn from Rockaway Point, New York to Sandy Hook, New Jersey; Long Island Sound inside

of a line drawn between Montauk Point Light to Southeast Light on Block Island.'"   Id. ¶ 58.   Despite this clear description, plaintiff points to, without any explanation or context, two screenshots of maps in order to argue that the Garden State's permitted routes "allow the vessel to travel in open ocean and thus do not fall within the exception of 46 CFR 42.03-5(b)(1)(v)." Pl. Reply at 5-6.   Not only do these maps fail to support plaintiff's argument, as both images suggest that the vessel's routes are in fact limited to lakes, bays, or sounds, but plaintiff points to no evidence or caselaw that would permit this Court to disregard the vessel's certificate of inspection in determining the applicability of the Protection of the Crew regulation.   Id. Moreover, as a matter of fact, the route of the vessel on the day of the accident was within its authorized route of lakes, bays, or sounds.

Second, the requirements of the Protection of the Crew regulation do not apply to "[m]erchant vessels of less than 150 gross tons." 46 CFR § 42.03-5(b)(1)(i).   The Garden State's certificate of inspection states that the vessel weighs 95 gross tons under the Regulatory Measurement System and 205 gross tons under the Convention Measurement System.   See ECF Nos. 29-3, 29-7 at 2.   While the parties disagree as to which measurement system applies, Pl. Counter 56.1 ¶ 55, when vessels have been measured

under both the Convention Measurement System and the Regulatory Measurement System, as was the Garden State, 46 CFR § 69.20(c) provides for the application of "thresholds in effect before July 19, 1994 using the vessel's Regulatory Measurement System tonnage," 46 CFR § 69.20(c)(3). The tonnage threshold provided for Protection of the Crew regulation was in effect before July 19, 1994, see Protection of the Crew, 33 Fed. Reg. 135, 10062 (July 12, 1968); thus, because its tonnage under the Regulatory Measurement System is less than 150 gross tons, the Garden State is excluded from the requirements of the Protection of the Crew regulation.

For these reasons, plaintiff has failed to identify any regulatory violation that would serve as the basis for a negligence per se or an unseaworthiness as a matter of law claim, or the application of The Pennsylvania Rule. Therefore, his motion on this ground is denied.

### b. Preclusion from Contesting Liability Based on Alleged Discovery Violations

Plaintiff also seeks one of the most drastic sanctions permitted under Rule 37 of the Federal Rules of Civil Procedure for discovery abuses -- the preclusion of a defendant from contesting liability. Pl. Mem. at 20-22. Specifically, the title of Point III of plaintiff's moving memorandum of law states:

> DEFENDANT SHOULD BE PRECLUDED FROM CONTESTING LIABILITY BASED UPON ITS FAILURE TO PRODUCE THE COMPLETE ACCIDENT REPORT, PHOTOGRAPHS TAKEN BY CAPTAIN ABDELRAHMAN AND VIDEO OF THE ACCIDENT SCENE

Pl. Mem. at 20.

It is well-settled that a case-dispositive sanction such as the one sought is "generally disfavored" and only available in "extreme circumstances." See, e.g., Burns v. Bank of Am., No. 03 Civ. 1685 (JCF), 2007 WL 1589437, at *10 (S.D.N.Y. June 4, 2007); see also Conway v. Dunbar, 121 F.R.D. 211, 212-14 (S.D.N.Y. 1988) (in light of defendants' "continuing, deliberate withholding of important discovery material" "central to the proof of plaintiff's allegations," the court precluded defendants from offering evidence at trial on the issue of liability). Equally established in the caselaw is that such drastic or harsh sanctions should only be imposed when lesser sanctions have been considered. Grammar v. Sharinn & Lipshie, P.C., No. 14 Civ. 6774 (JCF), 2016 WL 525478, at *3 (S.D.N.Y. Feb. 8, 2016) (courts "should always seek to impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future"); see also Update Art, Inc. v. Modiin Pub., Ltd., 843 F.2d 67, 71 (2d Cir. 1988) (observing that "[t]he harshest sanctions available [under Rule 37] are preclusion of evidence and dismissal").

Here, plaintiff seeks the imposition of one of the most severe sanctions (1) without any prior applications to the Court or Court orders, see Daval Steel Prods. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991), and (2) as the following discussion will demonstrate, having barely established even one disclosure failure.  Each alleged discovery violation will be examined in turn.

First, plaintiff cites to defendant's delayed production of the reverse side of an otherwise single-sided accident report involving this incident, which contained three handwritten words: "Boat is secured."  ECF No. 24-1 at 3.  The delay in production is immaterial, as this fact is undisputed and consequently not in bad faith.  In re Sept. 11th Liab. Ins. Coverage Cases, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (where a party produced evidence in an untimely manner, that party "should sustain liability for breaching its discovery obligations where such breach causes injury, but the moving party should not obtain a windfall for uncovering evidence that would have made little difference in the underlying case").

Second, plaintiff seeks sanctions because of the non-production of photographs taken by Captain Abdelrahman.  The record on these photographs is clear.  The captain testified to taking photographs of the damage to the vessel's exterior from the work

-19-

barge, but not of the interior from the lazarette.  Abdelrahman
Dep. 28:3 – 30:18; 32:21-24; Work Barge Video at 7:00-8:23.
Moreover, the captain testified that any photographs he captured
were taken prior to the removal of the hatch cover, and thus could
not reveal the position of the barricades.  Id.; Pl. Reply at 9.
Further, given the captain's testimony, plaintiff's speculation
about additional photographs is just that.  Indisputably, a party
cannot be required to produce that which does not exist.  Mason
Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs.,
Inc., 318 F.R.D. 28, 42 (S.D.N.Y. 2016) ("Generally, a party's
good faith averment that the items sought simply do not exist . . .
should resolve the issue of failure of production since one 'cannot
be required to produce the impossible.'"); Golden Trade, S.r.L. v.
Lee Apparel Co., 143 F.R.D. 514, 525 n. 7 (S.D.N.Y. 1992) ("the
discovering party must make an adequate showing to overcome" a
party's denial that it has possession of evidence).

Third, plaintiff seeks to preclude any defense on the merits
for defendant's non-production of video footage that defendant
maintains does not exist, as the relevant camera was not working
on the day of the incident.  Pl. Mem. at 20-22.  Again, a party is
not obligated to produce evidence that it asserts in good faith

does not exist.[13]   Here, plaintiff has failed to cite to any specific evidence challenging defendant's sworn statement that no responsive video surveillance exists.   See Margel v. E.G.L. Gem Lab Ltd., No. 04 Civ. 1514 (PAC) (HBP), 2008 WL 2224288, at *3 (S.D.N.Y. May 29, 2008).

Having examined each predicate for plaintiff's motion to preclude, it is beyond cavil that none of them even remotely meets the standard for the relief sought.   Accordingly, plaintiff's baseless motion for preclusion is denied.

## II.   Defendant's Motion for Summary Judgment

The Court now turns to defendant's motion for summary judgment on plaintiff's first cause of action, which consists of his claims for Jones Act negligence and unseaworthiness.

### a. Negligence Claim Under the Jones Act

#### i. Legal Framework

Under the Jones Act, a "seaman injured in the course of employment . . . may elect to bring a civil action . . . against the employer," 46 U.S.C. § 30104, for injuries suffered "due to negligence of his employer," Lewis v. Lewis & Clark Marine, Inc.,

---

[13] Alan Warren, defendant's Vice President and Director of Operations, filed a declaration stating that video surveillance does not exist because the camera was inoperable around the time of plaintiff's accident.   ECF No. 35 ¶ 11. Plaintiff disputed this fact on the ground that the declaration failed to comply with the requirements of 28 U.S.C. § 1746.   Pl. Reply at 6-7.   However, on July 7, 2023, defendant filed a supplemental declaration that fully complied with 28 U.S.C. § 1746.   ECF No. 50.   Thus, the Court will consider Warren's declaration.

531 U.S. 438, 441 (2001).  "Unlike the law of unseaworthiness, which focuses on the condition of the vessel, . . . the Jones Act places a separate and distinct duty on the owner to provide a reasonably safe workplace."  <u>Oxley v. City of New York</u>, 923 F.2d 22, 25 (2d Cir. 1991) (citation omitted).

In order to establish negligence under the Jones Act, a plaintiff must show "(1) that a dangerous condition actually existed on the ship; (2) that the defendant shipowner had notice of the dangerous condition and should have reasonably anticipated the plaintiff might be injured by it; and (3) that if the shipowner was negligent, such negligence proximately caused the plaintiff's injuries."  <u>Diebold v. Moore McCormack Bulk Transp. Lines, Inc.</u>, 805 F.2d 55, 58 (2d Cir. 1986).  "[I]n Jones Act cases, '[t]he right of the jury to pass upon the question of fault and causation must be most liberally viewed.'"  <u>Oxley</u>, 923 F.2d at 25 (citations omitted).  Thus, a plaintiff "shoulders a lighter burden for establishing negligence than her counterpart on land would carry."  <u>Wills v. Amerada Hess Corp.</u>, 379 F.3d 32, 45 (2d Cir. 2004) (cleaned up and citations omitted).  However, "[i]t is well established that summary judgment is warranted where there is an absence of evidence that could 'justify with reason the conclusion that employer negligence played any part, <u>even the slightest</u>, in

producing the injury.'" Id. at 50 (emphasis in original) (quoting Diebold, 805 F.2d at 57-58).

As part of an employer's obligation to provide a reasonably safe place to work under the Jones Act, a shipowner has a duty to warn seamen of dangerous conditions of which the employer should be aware. Thomas J. Schoenbaum, Admiralty & Mar. Law § 6:21 (6th ed. 2023). However, there is no duty to warn crewmembers of "open and obvious" dangers, particularly those of which the crewmember is aware. See, e.g., Patterson v. Allseas USA, Inc., 137 F. App'x 633, 637 (5th Cir. 2005) (quoting Farrell v. United States, 167 F.2d 781, 783 (2d Cir. 1948)); Vaughan v. All. Offshore, LLC, No. Civ. 18-5571, 2019 WL 1778694, at *4 (E.D. La. Apr. 23, 2019) ("[T]here is no duty to instruct an experienced seaman on matters within common sense, or to remind him of what he already knew or should have known."); Davila v. S/S Vercharmian, 247 F. Supp. 617, 620 (E.D. Va. 1965), aff'd, 372 F.3d 93 (4th Cir. 1967) ("Assuming that the lighting conditions were sufficient . . . there is certainly no duty to warn anyone approaching an open hatch which would be apparent to anyone through the medium of 'looking downward.' . . . Certainly the law has not reached the point where warnings must be issued to seamen who are approaching . . . an open hatch which is in plain view").

### ii. Application

Plaintiff asserts without support that the captain's failure to re-cover the open hatch after leaving the lazarette constituted negligence under the Jones Act, despite the captain's order that plaintiff set up barriers measuring the same length as the open hatch on at least two sides of the hatch.[14]  Pl. Opp. at 6-9. Defendant does not contest the first two elements required to prove such a claim -- namely, that the open hatch on the Garden State presented a dangerous condition and that defendant had notice of the dangerous condition.  See Def. Mem. at 12-15.  However, defendant maintains that plaintiff has not adduced sufficient evidence to establish that any negligence on the part of defendant caused his injury, as the open hatch constituted an open and obvious danger of which plaintiff was well aware.  Id.

It is undisputed that less than six minutes before the accident, plaintiff and the captain together removed the hatch cover and set up bright yellow barricades, which were approximately the same length as the sides of the open hatch, around at least

---

[14] Plaintiff also claims, again wholly without support, that the captain failed to re-cover the open hatch two separate times.  Pl. Opp. at 1, 6; see also Def. Counter 56.1 ¶ 32 (citing to no evidence in support of this assertion).  In fact, testimony directly contradicts this statement -- both plaintiff and the captain recall the captain entering the lazarette only once, after the captain had taken photographs of the exterior of the vessel and immediately following the removal of the hatch cover.  See Mezzina Dep. 89:3-25; Abdelrahman Dep. 32:13-24.

two sides of the hatch to warn the crew of potential danger.[15]  Pl.
Counter 56.1 ¶¶ 25-28, 30-32; see Work Barge Video at 9:00-14:42.
The captain subsequently entered the lazarette, and plaintiff
walked to the front of the vessel, where McCullough, the
incapacitated deckhand, was sitting and from where the barricades
surrounding the open hatch remained in plaintiff's direct view.
Pl. Counter 56.1 ¶ 36; Mezzina Dep. 100:14 – 101:9.  During this
time, plaintiff testified that he did not observe anyone moving
the barricades.  Id.  When the captain emerged from the lazarette
and ordered Mezzina to throw the captain an additional line to
further secure the vessel, plaintiff testified that he stood in
the middle of the vessel -- even closer to the hatch -- and that
he could see the barricades surrounding the open hatch.   Id.
101:10-25.

Shortly thereafter, plaintiff decided to run toward the stern
door of the vessel, which was located directly behind the open
hatch.[16]  Mezzina Dep. 92:18 – 93:24.  Although plaintiff does not

---

[15] The hatch opening was 39 inches long by 32 inches wide, and the barricades
were 39.5 inches high and wide.  Pl. Counter 56.1 ¶ 28; Def. Counter 56.1 ¶ 18.
As previously noted, whether the other two sides of the hatch were barricaded
is immaterial, as it is undisputed that plaintiff approached the hatch from the
front of the vessel before he fell, and neither party suggests that it was
possible to either erect a barrier or pass the open hatch on the port side of
the hatch between the hatch and the engine door.

[16] It is worth noting that both the captain and defendant's expert James Kline
explained that "a safe alternate route remained available" to plaintiff by going
"up one of the stairwells, aft the length of the vessel, then down the port

specifically recall seeing the barricades in place immediately preceding his fall,[17] plaintiff does not adduce any evidence that would create a genuine issue of material fact about whether the barricades remained around at least two sides of the hatch. Indeed, plaintiff's testimony was consistent that he did not observe anyone removing the barriers.  He has not controverted (1) his own testimony that he could see the barricades in place when he received the captain's order to retrieve an additional line to tie up the ship <u>after</u> the captain had exited the lazarette, or (2) the captain's testimony that he put the barricade back in place after exiting the hatch.  Mezzina Dep. 93:25 – 94:25, 101:10-25; Pl. 56.1 ¶ 45; Abdelrahman Dep. 50:14-16, 55:16-24.   Beyond plaintiff's admission that there were barriers in place when he was directed to retrieve another line, there is no basis in the admissible record to support a conclusion that the barriers were not in place when plaintiff approached the hatch: the captain had left the area; plaintiff had not moved the barricades as of then; and the third crew member was disabled and sitting at the opposite end of the vessel.

---

side stairwell to the stern deck mooring station."  ECF Nos. 42 ¶ 8; 42-2 at 13; <u>see also</u> Abdelrahman Dep. 51:5-17.

[17] Plaintiff testified that he did not check whether the barricades were still present before or while he ran toward the hatch.  Mezzina Dep. 94:5-13.

Considering the undisputed facts, plaintiff made a decision to pass the open hatch to retrieve an additional line, despite having removed the hatch cover less than six minutes earlier, having placed barriers to warn of the open and obvious danger, and having a totally safe alternative route to retrieve the additional line.[18]   Likewise, plaintiff cites no case law or other support suggesting that the captain acted negligently in failing to replace the hatch cover when he exited the hatch.   See generally Pl. Opp. at 6-9.   Indeed, even plaintiff's expert does not opine that that closing the hatch is required if "appropriate barricades" were put in place.   ECF 29-7 at 15.   In sum, plaintiff has failed to present any evidence establishing negligence on the part of either NY Waterway or the captain.   Wills, 379 F.3d at 50.   To the contrary, the undisputed facts suggest that plaintiff failed to take even the slightest precaution in avoiding an open and obvious danger of which he was well aware.   The undisputed facts are well within the caselaw, cited supra 23-24, finding no negligence on the part of shipowners in these circumstances.   Moreover, the facts favoring defendant are even stronger: here, before even removing the hatch cover, the captain ordered plaintiff to retrieve barriers to warn

_____

[18] Upon docking the vessel at the work barge, the captain and plaintiff had already secured the vessel with three of the four lines.   Pl. Counter 56.1 ¶ 38.   Plaintiff testified that he "generally [knew] what [he was] supposed to do" after arriving at the work barge and that no "other preparations . . . had to be made" after tying up three of the lines.   Mezzina Dep. 63:15 - 64:3.

the crew of the open hatch, and those barriers were installed and remained so prior to plaintiff approaching the hatch.  Given the undisputed facts, no reasonable jury could return a verdict for plaintiff on his Jones Act claim.

### b. Unseaworthiness

#### i. Legal Framework

Under the principle of unseaworthiness, a shipowner has "an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service."  Oxley, 923 F.2d at 24-25.  In contrast to a Jones Act claim, unseaworthiness "results in a species of liability without fault," and "does not depend on either negligence . . . or on notice."  Barlas v. United States, 279 F. Supp. 2d 201, 206 (S.D.N.Y. 2003) (internal citations and quotation marks omitted); see also Barlow v. Liberty Mar. Corp., 746 F.3d 518, 528 (2d Cir. 2014) ("In admiralty, ship owners are strictly liable for injury resulting from the unseaworthiness of their vessel and the vessel's appurtenances.").

However, while the duty to furnish a seaworthy ship "is absolute," "[t]he standard is not perfection, but reasonable fitness."  Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960); see also Martinez v. City of New York, 684 F. App'x 90, 92 (2d Cir. 2017) ("Seaworthiness does not demand an accident-free ship, only one reasonably fit to be at sea" (citing Lewis, 531

U.S. at 441)).  In order to establish unseaworthiness, a plaintiff must show that the vessel is "insufficiently or defectively equipped" and "that his injuries resulted from the unseaworthy condition of the vessel."  <u>Oxley</u>, 923 F.2d at 26; <u>Golden v. City of New York</u>, No. 14 Civ. 2229 (LAK), 2015 WL 4510439, at *1 (S.D.N.Y. July 24, 2015) ("[T]he burden is on the plaintiff to offer at least some competent proof" of an unseaworthy condition and defendant does not have the burden "to prove the negative."); <u>Barlow v. Liberty Mar. Corp.</u>, No. 08 Civ. 4436 (VVP), 2012 WL 12857416, at *7 (E.D.N.Y. Dec. 26, 2012), <u>aff'd</u>, 746 F.3d 518 (2d Cir. 2014) (Plaintiff must show "by a preponderance of the evidence that the ship, its equipment or crew, was unseaworthy").  Whether a ship is seaworthy "is relative and varies with the vessel involved and the use for which the vessel is intended."  <u>Atl. Specialty Ins. Co. v. Coastal Envtl. Grp. Inc.</u>, 945 F.3d 53, 68 (2d Cir. 2019) (citations and internal quotation marks omitted).

District courts in the Second Circuit have disagreed as to "what level of causation is required for unseaworthiness claims." <u>Juliussen v. Buchanan Marine, L.P.</u>, No. 08 Civ. 1463 (DCP), 2010 WL 86936, at *11 n. 26 (S.D.N.Y. Jan. 7, 2010) (collecting cases). While the court in <u>Milos v. Sea-Land Serv., Inc.</u>, 478 F. Supp. 1019, 1023 (S.D.N.Y. 1979), held that an unseaworthiness claim requires the same light showing of causation as a Jones Act claim,

most courts require that "1) the unseaworthiness played a substantial part in bringing about or actually causing the injury; and 2) that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Saleh v. United States, 849 F. Supp. 886, 895 (S.D.N.Y. 1994); see also Juliussen, 2010 WL 86936, at *11 n.26 (applying the Saleh standard); Lisowski v. Reinauer Transp. Co., No. 03 Civ. 5396 (NGG), 2009 WL 763602, at *13-14 (E.D.N.Y. Mar. 23, 2009) (same); Sadler v. Moran Towing Corp., 204 F. Supp. 2d 695, 697 (S.D.N.Y. 2002) (same). Under the Saleh standard for causation, "the mere fact that an accident occurs and a seaman is injured while using an appurtenance in the performance of his duties cannot, without more, establish that a vessel is unseaworthy." Golden v. City of New York, No. 14 Civ. 229 (AJP), 2015 WL 2237540, at *6 (S.D.N.Y. May 14, 2015) (internal quotations marks and citations omitted).

### ii. Application

Plaintiff's articulation of a claim of "unseaworthiness" is limited to two point headings: "THE CAPTAIN'S FAILURE TO RE-COVER THE HATCH AFTER HE LEFT IT TWICE CONSTITUTES NEGLIGENCE UNDER THE JONES ACT & RENDERS THE VESSEL UNSEAWORTHY," Pl. Opp. at 6, and "For similar reasons, the open hatch with no one in it constituted an unseaworthy condition," id. at 10. Essentially, plaintiff is reiterating his Jones Act claim, which for the reasons already

articulated is untenable.  In addition, plaintiff's articulation of his "unseaworthiness" claim is disingenuous: there was not simply an open hatch.  Rather, there were barriers on at least two sides of the hatch, including the side from which plaintiff approached the hatch before he fell.  Although plaintiff and the captain dispute whether a third side was barricaded, that side played no role in the incident, and there was no need for a barrier on the fourth side because the space between the hatch and the engine door was too narrow for even an attempted passage.  See supra pp. 4-5.

Plaintiff also seems to claim that the Garden State was unseaworthy despite the presence of bright yellow 39.5 inch by 39.5 inch barriers around the hatch.  Pl. Opp. at 11-12.  To the contrary, defendant maintains "[t]he undisputed facts show that the hatch was barricaded with a bright yellow, three-foot-plus high barricade which served as a visual barrier when [p]laintiff approached it and therefore that [p]laintiff had notice of the open hatch. Under the circumstances, on a docked, passenger-free vessel, [p]laintiff cannot prove negligence or unseaworthiness when he had notice of an open, but barricaded hatch, which is an open and obvious danger."  Def. Mem. at 14.

While it is true that unseaworthiness is typically a question for the jury, see, e.g., Oxley, 923 F.2d at 26, summary judgment

is appropriate here, as plaintiff has not presented any evidence that would lead a reasonable jury to conclude that the Garden State was insufficiently or defectively equipped when a hatch temporarily opened for inspection of the vessel was guarded by barriers adequate to serve as a protective warning, particularly when plaintiff had himself removed the hatch cover minutes earlier. More specifically, plaintiff fails to point to any facts, customs, practices, or caselaw that suggest that either the failure to re-cover or to provide a permanent physical barrier to guard a briefly uncovered hatch renders a ship unseaworthy.  In fact, analogous cases suggest the opposite, particularly when the open hatch was adequately lit, when plaintiff had notice of the opening, and when a safe alternative route was available -- all of which were the case here.  See, e.g., Valentine v. St. Louis Ship Bldg. Co., 620 F. Supp. 1480, 1483 (E.D. Mo. 1985), aff'd 802 F.2d 464 (8th Cir. 1986) (declining to hold a ship unseaworthy for failing to install railings around a temporarily open hatch situated in an adequately lit location where it was neither customary nor feasible to do so, particularly when the plaintiff knew that the hatch had been opened); Davila, 247 F. Supp. at 617-18 (dismissing unseaworthiness claim, among others, where the plaintiff neglected "to exercise even the slightest degree of care for his own safety" by failing to turn on lights that would have adequately lit an

open hatch "apparent to anyone . . . 'looking downward,'"
particularly as the plaintiff was "thoroughly familiar with the
area involved" and an alternate route was available); see also
Testa v. Moore-McCormack Lines, Inc., 229 F. Supp. 154, 158
(S.D.N.Y. 1964) (declining to find vessel unseaworthy where
plaintiff's fall was not proximately caused by the presence of
grease, but rather by his own negligence that did not "meet the
standard of care of the ordinary prudent man," especially in
consideration of safe alternative routes, among other things).

Plaintiff also argues in his opposition that the barricades
stored on the Garden State "were unsuitable and unsatisfactory
protection for the open hatch on a rocking vessel," and suggests
that defendant should have erected a physical barrier comparable
to the vessel's exterior safety rails. Pl. Opp. at 11-12. To the
extent that this argument relates to his claim of unseaworthiness,
plaintiff again fails to point to any persuasive facts or caselaw
supporting the proposition that a temporarily open hatch
constitutes unseaworthiness unless it is surrounded by a non-
movable physical barrier. Id. Instead, plaintiff attempts to
argue that defendant's expert James Kline "equat[ed] the barricade
to the 'safety rail on the exterior of the vessel,'" implying that
the vessel failed to comply with the safety rail requirements of
46 CFR § 116.900. Id. at 12. However, this completely misstates

-33-

Kline's testimony, which simply compared the height of the Melba Swintex barricades to the height of vessel's exterior safety rails. ECF 42-2 at 13 (concluding that "[i]t appears that this barricade's design and construction is meant to be a visual barrier and not a physical one. It's [sic] height (39.5-inches) is equivalent to the safety rail on the exterior of the vessel.").

Moreover, even plaintiff's own expert, Captain Joseph Ahlstrom, did not go so far as to suggest that defendant was obligated to guard the temporarily opened hatch with the equivalent of exterior deck rails.  ECF No. 29-7 at 15.  Instead, Captain Ahlstrom concluded that "[u]pon leaving the hatch, Captain Abdelrahman should have either (a) replaced the hatch cover; or (b) ensured that appropriate barricades were in place, especially given the rough sea conditions which caused the vessel to rock." Id.  In no way does this support plaintiff's contention that the use of moveable barricades on a docked vessel constitutes unseaworthiness, as there has been no suggestion by plaintiff or otherwise that the barricades were displaced by natural forces.[19] Plaintiff's argument that defendant was required to create a non-moveable physical barrier in the context of a temporary reason for

---

[19] Moreover, because the undisputed facts indicate that the captain returned the barricades to their original position surrounding the hatch after exiting the lazarette, as discussed above, the captain satisfied the requirements outlined by plaintiff's expert.

the hatch to be open for a matter of minutes, especially when the captain directed the installation of substantial barricades measuring 39.5 inches high and 39.5 inches wide around the opening that plaintiff had created and barricaded less than six minutes before, is wholly untenable.

Because plaintiff has failed to offer any proof of a defective condition on the Garden State or that the vessel or its appurtenances were not fit for their intended purpose, Golden, 2015 WL 4510439, at *1, this Court grants defendant's motion for summary judgment on plaintiff's unseaworthiness claim.

**CONCLUSION**

For the reasons set forth above, defendant's motion for partial summary judgment is granted as to plaintiff's claims under the Jones Act and general maritime law.  Plaintiff's motion for partial summary judgment as to claims of negligence <u>per se</u> and unseaworthiness as a matter of law is denied.  Further, plaintiff's motion to sanction defendant for alleged discovery disputes by precluding defendant from contesting liability is also denied. The Clerk of Court is respectfully directed to close the motions pending at ECF Nos. 27 and 37.



**SO ORDERED.**


Dated:    New York, New York
          February 20, 2024

                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

-36-

## APPENDICES

## A. Appendix A



**B. Appendix B**



**C. Appendix C**



## D. Appendix D

